Thank you, Your Honor. Ben Coleman for the appellant, Momoud Abaji. I was going to start with the clear and convincing evidence standard of review. I had been away on vacation and I just learned that this court recently granted in-bank review in a case called United States v. Lucas, which may be considering this very issue. I'm going to ask that the court not defer this case pending Lucas. I was going to ask you about that, so thanks for raising that. And the first reason is a practical reason. In my brief, I had indicated that Mr. Abaji's projected release date was in July of 2025. As often happens, those dates get moved up as the defendant serves more time. I yesterday confirmed that his release date has now been moved up to July of 2024, so we're talking about less than a year. So after Lucas, the practical reality is that by the time Lucas is decided, Mr. Abaji will likely already have been released or about to be released. There will be no way to get him back for resentencing, I don't think, practically speaking, if certain time estimates would hold. So I would ask that the court not hold the case. The second reason why is, I think, more of a legal reason, which is that the Lucas case does not involve any acquitted conduct. In this case, there's at least a partial acquittal, and so I don't know that Lucas will address whether, if there is at least a partial acquittal, whether a different standard of review should apply. So for those two reasons, I would ask the court to go forward with the case and to decide it on the current state of Ninth Circuit precedent. Obviously, if something changes between now and the time that Mr. Abaji is resentenced, the district court can look at Lucas or whatever else may come into play, and you never know what the parties can agree on on a remand and things like that. So I would ask that the case go forward. And we think the case should be reversed on the standard of review. In this case, there was a lot of dispute about what the loss was and certain questions as far as what Mr. Abaji should be held accountable for and certain intermediate determinations like in Lanish that needed to be considered, particularly given that a lot of the loans had been resold and things like that. And you also had the partial acquittal. And then, in addition, and this also, I think, goes to the actual substantive issue about loss, the lead co-defendant in the case, a gentleman by the name of Khatib, he was given a lesser loss calculation under the guidelines. And there was no explanation for why Khatib received a lesser loss calculation than Mr. Abaji did, when clearly Khatib was the ringleader of the whole enterprise. So when you look at all those things into account, both on the standard of review and substantively as to the amount of loss, it's our position that the case should be sent back for a further determination on the loss. Why isn't this just largely based on the conduct of conviction in terms of the loss amount? I mean, you have an acquittal, but it's not, it's this kind of small piece of the overall puzzle, right? Well, in this case, the conspiracy count did not allege any amount of loss at all. And the conspiracy count itself only mentioned a handful, in the indictment, only mentioned a handful of loans. It didn't mention all these 109 loans that the government used at sentencing. In addition- Right, but weren't those within the scope of the conspiracy? Well, that was the question. The jury never made that determination. And particularly as to the amount of loss, the jury was specifically instructed that it did not have to find any loss at all. It also was given reasonable foreseeability instructions that it could hold Mr. Abaji accountable for substantive acts that were reasonably foreseeable as part of the conspiracy. And then it still acquitted him on one of the loans. So I do believe that's at least the jury determination that Mr. Abaji should not have been held accountable, even under a reasonable foreseeability standard, for the entire amount of loss in the conspiracy. So are you asking this to go back, not just for a redetermination of the loss, but for a jury trial to determine what the loss was? What's the relevance that the jury did not address the issue? Well, I think the relevance is, number one, on the standard of review. I mean, the standard of proof that this court has said in Lonage, and I know Your Honor wrote Lonage, so I'm not going to pretend to know more about what Lonage says than you do. But I believe Lonage said that if you do have some acquitted conduct that is in the mix, that is a significant factor in determining what the standard of proof should be. And in this case, the district court explicitly said, rejected the clear and convincing standard and said it was only going to use a preponderance. But it has to be a substantial impact. Is the one loan a substantial impact on the jury verdict here and on the amount of the loss determination? Well, I don't know that it necessarily has to be a substantial impact, but even assuming that is the standard, I do think that when the jury was only asked to consider six substantive loans and it acquitted on one of them, and it wasn't asked to consider any of the other 103 loans that the government is seeking to hit Mr. Abadji with, that is a legitimate consideration. What was the value of that one loan, though, that he was acquitted on? I think it was in the neighborhood of about $200,000. Does it make any difference then? I mean, we're talking about the 20 level enhancement, right? So you've got to be above $9.5 million. So you knock off $200,000. It's not going to get him below $9.5 million. Well, that's correct. If you just were to back out that loan, it wouldn't. But I do think that the jury's verdict, though, shows that just this general principle that, well, there are these 109 loans. Mr. Abadji can be held accountable for all of them because they all were reasonably foreseeable. I think the jury's verdict undermines that analysis because the jury found that not all of those loans were reasonably foreseeable. So you want to take the one acquitted conduct and sort of project it onto the larger conspiracy? Correct. Particularly when the conspiracy count here only mentioned a few loans, it didn't require any amount of, for the jury to determine any amount of loss. They were instructed that they didn't have to determine any amount of loss. When you have those factors, when you weigh all, and the acquittal, when you weigh all that into the mix, and when you weigh that the lead defendant received a lesser loss calculation, when you look at the totality of all those circumstances, a higher standard of proof should have applied. I don't know if you've had a chance to see a decision from a district judge in California. It's January of this year. It's the Holmes case, Elizabeth Holmes. And the judge there, I thought, very succinctly took the Lonick decision and applied it to a conspiracy case. And the dispute in that case was also what's the appropriate standard of proof. And in that case, preponderance was confirmed. It was a conspiracy case. There was not a disproportionate effect with respect to conviction in the sentencing. And the court confirmed under the fourth factor in Lonick that it need only be established by a preponderance of the evidence. Courts have declined to apply the clear and convincing proof when the enhancement issue was based entirely on the extent of the conspiracy. So you might want to take a look at that case. It seems to me it fits right on with this case and suggests that preponderance is the appropriate standard. Your comment? Well, I haven't read that opinion, but I obviously am familiar with that case. It's a very high profile case. I think the distinction between this case and that case is that if I understand, and I'm not intimately familiar with the facts of the case, but if I understand it generally from the press reports, is that Ms. Holmes basically ripped everybody off. I mean, it was a bogus blood test or something like that. And so all these people invested all this money and lost all this money because it was a fraud. It was a total bogus test. We have a difference. So there was no intermediate determinations of fact that needed to be made as to what actually was lost. We know what was lost because this is what the people invested and they didn't get the money back. Here we have a question as to what actually was lost. We don't really know because loans were sold off and there are all these intermediate questions as to what actually did the various banks or subsequent banks lose based on the transactions that occurred. So I don't think in Holmes there were any intermediate factual determinations that needed to be made, whereas in this case there were, and that I think would be the little under a minute. We'll give you two minutes when you come back. Thank you. Thank you Mr. Coleman. Good morning and may it please the court. Alexander Schwab on behalf of the United States. Blanich established a dichotomy between on the one side cases in which the defendant had been sort of wholly encompassed the enhancements that were at issue. And the dichotomy it sets up is between, as example cases, Garrow and Mesos de Jesus. Garrow was a case in which the defendant lost based on the fact that the conduct that forms the basis for the enhancement was clearly the conduct for which the defendant was charged and convicted. Right. So Mr. Coleman says, well, that's not the case here because of the acquittal on one count. So how do you deal with that? So the other end of the dichotomy wasn't a case where there's one or two acquittals. It was a case in which the conviction was on being an undocumented person in possession of a firearm. And then the enhancements were based on having committed this offense during a kidnapping, which is obviously wholly unrelated. But I actually think here the most controlling aspect of this court's case law is Treadwell. Treadwell is dispositive here. And I'll specifically point out that in that case, all three defendants were charged with one count of conspiracy to commit wire fraud and four counts of wire fraud. And there were multiple defendants in that case. But the court noted that Saturday, that was the name of one of the defendants, was convicted on the conspiracy count and three of the four wire fraud counts. But the analysis for him was the exact same as those convicted on all of the substantive counts. That's exactly the fact pattern that we have here. The question is, does one acquittal on one substantive count suddenly remove the analysis entirely from the GARO end of the loanage dichotomy and put it all the way on the Mesas de Jesus end? I'd submit it does not, and Treadwell stands for that proposition. But I also note, you know, my friend just mentioned that there was a lot of dispute before the district court as to what the loss was. I don't think that's quite right. I think there was a lot of dispute on remand as to what the methodology was for calculating the loss. There wasn't really a dispute, a factual dispute, about the math that the government was doing under the Morris framework. So assuming the Morris framework is applicable, which was what was directed on this court's prior decision, then there really wasn't a factual dispute. Rather, the defense expert was quibbling with aspects of the Morris methodology itself. For example, the 50, I believe it was $53,000 figure that the defense was submitting as an alternate loss figure was based on its calculation of the personal gain to this defendant. That's obviously not what Morris directs the court to do. In fact, and I think the best citation for this is page 375, that would be volume two of the excerpts of record. On cross-examination, the defense expert was asked whether using the methodology of taking the principal amount of the loan and subtracting the resale amount of the property, whether that math added up. And the defense expert didn't quibble with the math. The defense expert quibbled with the methodology, said that's what your calculation does. So I'd ask the court to look there to see. Basically, there wasn't a question as to what the math was if you take the principal and you subtract the resale value. So ultimately, the question of the actual standard that's being used is immaterial to what actually happened here. Your opponent argues that co-defendant or co-conspirator Khatib, the lead guy, got lesser treatment. What do you say to that? And why shouldn't we just have that apply to this case? A couple things, Your Honor. First off, while it is true that the sentencing of Khatib came later, the plea agreement the government entered into with him was signed far earlier and at a time where the full scope of loss wasn't understood. The fact that this defendant benefited from the government's ignorance at that time of the full scope of the conspiracy wouldn't be the first time that that happened. And in any event, that doesn't justify a windfall here. I'll note, by the way, that even though the guidelines loss calculation was lower for Khatib, if you look at the judgment, the restitution figure is precisely the same as the restitution figure here. So obviously, constrained as it was, the government did provide accurate facts to that court. You know, I did want to note one thing with respect to the restitution versus the guidelines loss calculations, and I know it didn't come up in my friend's argument just now, but I did want to highlight the fact that, yes, there is a disparity between the numbers. That disparity is something that is not necessarily problematic and not something that should be unexpected. Restitution and guidelines loss are getting at two different considerations. For purposes of guidelines loss, the court's trying to understand the full scope in order to assess the severity of the conduct to craft an appropriate sentence. And for restitution, the purpose is to make the individual victims whole without granting them some unexpected windfall. And that sort of sets up, on the one side for guidelines loss, you have Morris, and on the other side for restitution loss, you have Young. And so in some instances, restitution can be higher because some things that are explicitly excluded from guidelines loss are permissible under the MVRA. So for example, prejudgment interest, things of that nature, some of the costs that are incurred by the victims. So it does make sense that for some of the individual loans, the loss is going to be higher for restitution purposes. On the other hand, sometimes the loss figure, the total loss figure under the Morris framework is going to be higher because even though it's excluding these other types of loss considerations, sometimes in assessing what the loss is, you don't have a full picture as to who's bearing those individual losses. So for example, as Special Agent Campbell put in her declaration in connection with the sentencing here, some of the banks had gone out of business that were impacted here. So obviously when you're trying to collect individualized information with respect to the harm suffered by individual victims, that's going to be difficult in that situation. And very specifically, to the extent, sometimes by the way, I know that the defense listed a chart with restitution figures that were higher than the guidelines loss figures in the blue brief, I believe at pages 23 to 24. Sometimes that comes out the opposite direction, however. So for example, the Morris framework yielded results that came out the other way with respect to what's called loan number three in schedule one, which on remand used the Morris calculation. And that listed a $274,200 after subtracting the resale value from the property. That same loan had been listed as loan number 29, I realize it's a little bit confusing, in schedule A that was used at the original sentencing. And that formed the basis for both the original loss calculation and the current restitution figure. But there, the loss was only reported as $26,460, the victim for that being city mortgage. And there's a simple reason for that, that those were the costs that city mortgage incurred, but there are downstream victims. And whether they're indemnifiers, whether those are secondary purchasers of the loans, that might not be something we can get our fingers on. But ultimately, it's someone who bore a loss. But since we don't know who they are, we're not able to ask that they be awarded restitution per young. But at the same time, the Morris framework is still appropriately encompassing that conduct within this scope. And at the beginning, I just want to get your response. Mr. Coleman said, please don't hold the case for Lucas. Does the government have a position on that? Well, obviously, the government's chief position is that even under the current case law, particularly under Treadwell, this is a case in which the preponderance standard would be correct. And even under a heightened standard, there wasn't a factual dispute about the loss calculation. Should all that be disagreed with by this court, I would ask that this decision be held until a decision there. I don't want to make promises, but frankly, just the time it takes to even go down and have a resentencing and have a recalculation of these figures probably isn't going to speed things along any faster. But understand the practicalities. I think that the court would benefit from, since the court has stated that this is an issue that it wants to reconsider, that instead of issuing a hasty opinion on this under the current framework, that it wait and understand what the Ninth Circuit's going to be doing going forward. Unless the court has any more questions, I'd submit. Thank you, Mr. Schwab. I just wanted to make two points. First, Judge Zawahiri had asked about the co-defendant Khatib. And the government's response was, well, we entered into this plea agreement before we knew the full scope of the case. But the problem is not just the plea agreement, it's that the district court, after all the trials and after Mr. Abadji had been sentenced and all the co-defendants had been sentenced, after all that occurred, the district court adopted the lower loss calculation. So it's not just the government's plea agreement, it's that the district court, at the end of the day, after all these facts had been aired, went ahead and adopted a lower guideline figure for Khatib, who clearly was more culpable than Mr. Abadji. At the end of the day, that just doesn't sound very fair. If you have to estimate an amount of loss and you're going to sort of apply a rule of lenity and fairness, it would seem to be the fair thing that if that's what the district court ultimately did for the ringleader, it should have done the same for Mr. Abadji. That's really our concern. The second thing on the restitution, I don't disagree with a lot of what my friend said about restitution. There can be different amounts depending on how everything shakes out. The problem we have here is that there clearly were certain costs that this court sent back on the first appeal. It sent it back because there were impermissible costs that were included. And we just don't know whether those costs were permissible for restitution or not. There were no findings in that regard. It's the government's burden. It's not my burden. It's the government's burden to show that all those costs were permissible. And they themselves are saying now, we can't really figure it all out because some of the banks went under. We don't have all the information. We don't know. But didn't they make an attempt to follow the directive and follow Morris and they rejected what they did before and presented a whole new table of laws? Right. And they did that for the guidelines. But for restitution, they didn't. What they should have done if they wanted to use the amount that this court previously reversed, they should have gone and explained all these costs that are included are permissible for restitution purposes. And the final point that I wanted to say is that if this court were to, let's say, reverse for restitution, I think you could avoid the issue about whether to hold this case for Lucas. You could just say we're reversing on that ground and we're just going to send it back for an open sentencing. And then you could avoid whether to wait for Lucas or not. It's our position. And we would ask the court not to wait for Lucas. But if you were to reverse on another ground, then Lucas doesn't really matter. Thank you. Thank you, Mr. Coleman. This matter is submitted.
judges: RAWLINSON, BRESS, Zouhary